## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KRISTINE C. ZANDER,        )
                                  )
       Plaintiff,           )
                                  )
   vs.                   )       **Case No. 4:11CV1378 LMB**
                                  )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,   )
                                  )
       Defendant.         )

### MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Kristine C. Zander for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 12). Defendant filed a Brief in Support of the Answer. (Doc. No. 15).

### Procedural History

On March 13, 2009, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on February 2, 2009. (Tr. 128-37). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated November 9, 2010. (Tr. 52-59, 21-31). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on June 13, 2011.  (Tr. 15, 1-3).  Thus,

the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on July 28, 2010.  (Tr. 38).  Plaintiff was

present and was represented.  (Id.).  Vocational expert Matthew Brozinski was also present.

(Id.).

The ALJ examined plaintiff, who testified that she was forty-six years of age and was a

high school graduate.  (Id.).  Plaintiff stated that she had no formal education after high school.

(Id.).

Plaintiff testified that she worked in the past as a medical assistant.  (Id.).  Plaintiff stated

that she coordinated clinical research at this position.  (Tr. 39).

Plaintiff testified that she also worked performing clinical research for Dr. Richard

Muckerman for four to five years.  (Id.).  Plaintiff stated that she lifted ten pounds or less at both

of these positions.  (Id.).

Plaintiff testified that she last worked on February 2, 2009.  (Id.).  Plaintiff stated that she

stopped working at this time due to her illness.  (Id.).  Plaintiff testified that she experienced fever,

chronic fatigue, vomiting, and inability to concentrate.  (Tr. 40).

Plaintiff stated that she was hospitalized in February of 2009 for respiratory failure due to

polysubstance abuse of vodka, Fentanyl,[1] and Xanax.[2]  (Id.).  Plaintiff testified that she did not

have a problem with alcohol or drugs until she was diagnosed with lupus.  (Id.).  Plaintiff stated

that she attended outpatient rehab through St. John's in 2009.  (Id.).

      Plaintiff testified that she received emergency room treatment for anxiety attacks in May

of 2010.  (Tr. 41).

      Plaintiff stated that Dr. James Esther, a rheumatologist, diagnosed her with lupus[3] in 2008.

(Id.).  Plaintiff testified that Dr. Esther fired her as a patient in May of 2009 due to a

disagreement.  (Id.).  Plaintiff explained that she did not want to take steroids because they made

her manic.  (Id.).  Plaintiff testified that she requested more narcotics on one occasion, and Dr.

Esther recommended that she see a psychiatrist.  (Id.).  Plaintiff stated that she did see a

psychiatrist.  (Id.).

      Plaintiff testified that she last consumed alcohol in December of 2009, which was after she

attended rehab.  (Tr. 42).

      Plaintiff stated that she started seeing Dr. Zhang, a psychiatrist, approximately one year

prior to the hearing for treatment of her anxiety and depression.  (Id.).  Plaintiff testified that she

---

[1]Fentanyl is a potent opioid substance indicated for the management of persistent moderate to severe chronic pain that requires continuous, around-the-clock opioid administration for an extended period of time.  See Physician's Desk Reference, ("PDR"), 2406-07 (63rd Ed. 2009).

[2]Xanax is indicated for the treatment of anxiety and panic disorders.  See WebMD, http://www.webmd.com/drugs (last visited September 13, 2012).

[3]Systemic lupus erythematosus ("SLE") is an inflammatory connective tissue disease with variable features, frequently including fever; weakness and fatigability; joint pains or arthritis resembling rheumatoid arthritis; diffuse erythematous skin lesions on the face, neck or upper extremities; anemia; and a positive LE cell test result.  Stedman's Medical Dictionary, 1124 (28th Ed. 2006).

also discussed her problems with alcohol and drugs.  (Id.).  Plaintiff stated that she sees Dr. Zhang

every other month for treatment of her depression and anxiety.  (Id.).  Plaintiff testified that, due

to her depression and anxiety, she experiences panic attacks, helplessness, and low mood.  (Id.).


Plaintiff's attorney examined plaintiff, who testified that she experiences panic attacks in

stressful situations, or when she thinks about her son in Afghanistan.  (Tr. 43).  Plaintiff stated

that she occasionally experiences panic attacks due to her anemia.  (Id.).  Plaintiff testified that she

experienced panic attacks about once every other week.  (Id.).  Plaintiff stated that the panic

attacks last about an hour.  (Id.).  Plaintiff testified that she takes Klonopin,[4] which helps her panic

attacks, although it takes a while to become effective.  (Id.).

Plaintiff stated that she has difficulty being around groups of people.  (Id.).  Plaintiff

explained that, due to her illness, she has difficulty trying to find the proper words to use when

speaking.  (Id.).

Plaintiff testified that she has difficulty focusing.  (Tr. 44).  Plaintiff stated that she has to

constantly re-read things.  (Id.).  Plaintiff testified that Dr. Zhang has described this problem as

"lupus fog," and has prescribed medications.  (Id.).  Plaintiff stated that she has noticed some

improvement since she started taking medication.  (Tr. 45).

Plaintiff testified that she experiences lupus "flares" approximately every other week.

(Id.).  Plaintiff stated that a typical flare lasts three days.  (Id.).  Plaintiff stated that she

experiences vomiting, neuralgia in the left side of her face, low-grade fever, and extreme fatigue.

(Id.).  Plaintiff testified that, when she experiences extreme fatigue, she sleeps and isolates herself.

[4]Klonopin is indicated for the treatment of panic disorder.  See PDR at 2639.

(Id.).  Plaintiff testified that her flares vary in severity.  (Id.).  Plaintiff stated that, during a bad flare, she vomits constantly, becomes dehydrated, has pain in her left side, and experiences fatigue.  (Id.).  Plaintiff testified that, during a recent severe flare, one of her lymph nodes was extremely swollen and was infected.  (Id.).  Plaintiff stated that she tries to stay in bed and avoid people during a flare.  (Id.).

Plaintiff testified that she was prescribed steroids for her lupus, but she was unable to take the medication because it made her manic, unable to sleep, and caused her to experience hallucinations.  (Tr. 46).  Plaintiff stated that Dr. Zhang described these episodes as steroid psychosis.  (Id.).

Plaintiff testified that she lives with her parents in her parents' home.  (Id.).  Plaintiff stated that her parents do not help her during a flare because no one is able to help.  (Tr. 47). Plaintiff testified that she had been unable to find another rheumatologist who takes Medicaid since she stopped seeing Dr. Esther.  (Id.).  Plaintiff stated that she receives treatment during her flares at an urgent care facility.  (Id.).

Plaintiff testified that she did not experience any side effects from the medications she was taking at the time of the hearing.  (Id.).

The ALJ then examined the vocational expert, Matthew Brozinski.  The ALJ asked Mr. Brozinski to assume a hypothetical claimant with plaintiff's characteristics and the following limitations: able to lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk six hours out of eight; sit for six hours; occasionally climb stairs or ramps; never climb ladders or scaffolds; occasionally stoop, kneel, crouch and crawl; avoid concentrated exposure to the hazards of unprotected heights and moving machinery; able to understand, remember and

carry out at least simple verbal instructions and non-detailed tasks; able to demonstrate adequate judgment to make simple, work-related decisions; and able to adapt to routine, simple work changes. (Tr. 47-48). Mr. Brozinski testified that the individual would be unable to perform plaintiff's past relevant work. (Tr. 48). Mr. Brozinski stated that the individual would be able to perform other work, such as parts assembler (280,000 positions nationally, 1,800 to 2,000 positions locally); and production assembler (800,000 positions nationally, 4,500 to 5,000 positions locally). (Tr. 48-49).

The ALJ next asked Mr. Brozinski to assume the same limitations as the previous hypothetical, except that the individual was able to lift ten pounds occasionally and less than ten pounds frequently; stand or walk for two hours out of eight; and sit for six hours out of eight. (Tr. 49). Mr. Brozinski testified that the individual would be able to perform sedentary work, such as final assembler of optical goods (40,000 positions nationally, 1,000 positions locally); and bench hand inspector (34,000 positions nationally, 2,000 positions locally). (Id.).

Plaintiff's attorney then examined Mr. Brozinski, who testified that an individual who would miss work more than three times a month on a consistent basis would be unable to maintain a full-time competitive job. (Tr. 50).

Mr. Brozinski stated that an individual who had no limit in sitting, was able to stand or walk for a half hour a day, lift twenty pounds, and could only work four hours a day would be unable to maintain full-time work. (Id.).

## B.   **Relevant Medical Records**

The record reveals that plaintiff saw Dale Stegeman, M.D. for various complaints, including pain and anemia, from June 2007 through July 2009. (Tr. 347-49). Dr. Stegeman

prescribed medication for plaintiff's complaints.  (Id.).

Plaintiff presented to rheumatologist James Esther, M.D., on September 30, 2008, with complaints of fatigue, weight gain, joint aches, and hair loss possibly related to lupus.  (Tr. 628). Upon examination, Dr. Esther noted that plaintiff had a rash, oral ulcers, and hair loss.  (Tr. 634).

Plaintiff was hospitalized at St. Luke's Hospital from October 8, 2008, through October 13, 2008, for weakness and tachycardia.[5]  (Tr. 239).  It was noted that plaintiff tested positive for ANA,[6] had weakness, multiple arthralgias[7] and photosensitivity.  (Id.).  Two days prior, plaintiff developed nausea, vomiting, and diarrhea.  (Id.).  Plaintiff had been diagnosed with systemic lupus erythematosus ("SLE").  (Id.).  Plaintiff was diagnosed with flare-up of SLE, and was given IV steroids.  (Tr. 240).  Plaintiff's diarrhea and dehydration resolved with IV fluids.  (Id.).  Plaintiff was discharged on oral steroids with instructions to follow-up with Dr. Esther.  (Id.).

Plaintiff presented to Dr. Esther on January 19, 2009, with complaints of swollen legs and feet.  (Tr. 389).

Plaintiff was admitted at St. Luke's Hospital from January 19, 2009, through January 22, 2009, for evaluation and treatment of exacerbation of SLE.  (Tr. 214).  Plaintiff complained of peripheral edema, shortness of breath, abdominal bloating, and severe fatigue.  (Id.).  Plaintiff's connective tissue disease stabilized on steroids, and she was found to be anemic.  (Id.).  Plaintiff was referred to Barnes Hospital for further evaluation.  (Id.).

---

[5]Rapid beating of the heart.  Stedman's at 1931.

[6]The antinuclear antibody ("ANA") is an antibody found in a high proportion of patients with SLE.  Stedman's at 103.

[7]Joint pain.  Stedman's at 159.

Plaintiff saw Dr. Esther on January 29, 2009, with complaints of blisters on her tongue, and severe joint pain.  (Tr. 381).  It was noted that plaintiff had been seen in the emergency room the previous night.  (Id.).

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on February 3, 2009, with complaints of muscle pain due to a lupus flare-up.  (Tr. 283).  Plaintiff was diagnosed with myalgia[8]/myositis,[9] arthralgia, anxiety, and SLE.  (Tr. 301).  Plaintiff was given pain medication and was discharged in stable condition.  (Id.).

Plaintiff was admitted at St. John's Mercy Medical Center from February 23, 2009, through February 25, 2009, for respiratory failure secondary to polysubstance overdose.  (Tr. 316).  It was noted that plaintiff decided to place multiple Fentanyl patches and drink a lot of vodka due to uncontrolled pain, and that her family found her unresponsive.  (Tr. 317).  Plaintiff's pain medication strategy was discussed, and it was decided that plaintiff's daughter, who was a nurse, would help dispense plaintiff's medications.  (Id.).

Plaintiff saw Dr. Esther in the emergency room at St. Luke's Hospital on May 13, 2009, for evaluation and treatment of nausea, vomiting, diarrhea, dehydration, and exacerbation of SLE.  (Tr. 698).  Plaintiff reported increasing joint pain, muscle pain, and muscle spasm, nausea, vomiting, and intermittent diarrhea.  (Id.).  Upon examination, Dr. Esther noted that plaintiff's joints revealed very mild early inflammatory changes and tenderness diffusely, which was typical of SLE flare.  (Tr. 699).  Dr. Esther diagnosed plaintiff with SLE; nausea, vomiting, and diarrhea; dehydration; severe fatigue; chronic myositis; alcohol excess; and depression.  (Id.).  Plaintiff was

---

[8]Muscular pain.  Stedman's at 1265.

[9]Inflammation of a muscle.  Stedman's at 1275.

admitted for steroid therapy.  (Id.).

In a handwritten note dated May 2009, Dr. Esther indicated that plaintiff had attempted to secure narcotics on multiple occasions, and that he told plaintiff's mother that plaintiff had a narcotic problem and needed help.  (Tr. 362).  Dr. Esther stated that he was sorry that plaintiff had put him in that position and that he would have to discharge her as a patient.  (Id.).

In a letter to plaintiff dated May 28, 2009, Dr. Esther stated that he found that the physician-patient relationship had deteriorated beyond repair and, as a result, he could no longer provide her with medical care.  (Tr. 695).  He indicated that he would terminate the physician-patient relationship in thirty days, to allow plaintiff time to obtain another physician.  (Id.).

Plaintiff presented to psychiatrist L. Peter Zhang, M.D., Ph.D, on July 6, 2009, at which time her affect was described as dysthymic.[10]  (Tr. 729).  Plaintiff complained of pain.  (Id.).  Dr. Zhang prescribed Cymbalta[11] and Klonopin.  (Id.).  On August 6, 2009, plaintiff complained of loss of desire and motivation and poor concentration.  (Tr. 728).  Upon examination, plaintiff's affect was dysthymic.  (Id.).  Dr. Zhang prescribed Adderall[12] and Seroquel.[13]  (Id.).

Plaintiff presented to psychologist Dr. Alan J. Politte on July 22, 2009, for a psychological

---

[10]Relating to dysthymia, which is a chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by poor appetite, insomnia or hypersomnia, low energy, fatigue, low self-esteem, poor concentration, and feelings of hopelessness.  Stedman's at 602.

[11]Cymbalta is indicated for the treatment of major depressive disorder, generalized anxiety disorder, diabetic peripheral neuropathic pain, and fibromyalgia.  See PDR at 1801.

[12]Adderall is indicated for the treatment of ADHD.  See PDR at 3013.

[13]Seroquel is indicated for the treatment of mood disorders including bipolar disorder and schizophrenia.  See WebMD, http://www.webmd.com/drugs (last visited September 13, 2012).

evaluation at the request of the state agency.  (Tr. 456-60).  Plaintiff reported that she moved out of her living arrangements with her fiancé to live with her parents so that someone could help her if she falls.  (Tr. 460).  Plaintiff indicated that she spent her days taking naps and watching television, and did not read.  (Tr. 457).  Plaintiff reported that she experiences severe depression and muscle weakness.  (Tr. 459).  Upon mental status examination, plaintiff's eye contact was fair and her responses to questions were coherent, relevant, and logical.  (Tr. 458).  Dr. Politte found that plaintiff's ability to understand conversation and interact socially were good.  (Id.).  Plaintiff's long-term memory and short-term memory were described as "fair."  (Id.).  Plaintiff denied suicidal thoughts, but indicated that she can be sad and depressed.  (Id.).  Dr. Politte diagnosed plaintiff with major depressive disorder[14] (recurrent, severe, without psychotic features), and assessed a GAF score[15] of 35.[16]  (Tr. 460).  Dr. Politte concluded that, "[a]lthough [plaintiff] seems to be able to handle typical concentration, memory, judgment and thinking questions, it is clear that she was not able to go to work.  Her desire is to get well and return to employment." (Id.).

        Plaintiff saw Sandra Tate, M.D. on July 23, 2009, for an independent medical examination

---

[14]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's at 515.

[15]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[16]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).  DSM-IV at 32.

at the request of the state agency.  (Tr. 465-66).  Plaintiff reported that her pain was an eight on a scale of zero to ten, and was aggravated with bending, standing, kneeling, and walking.  (Tr. 465).  Upon physical examination, Dr. Tate noted only slightly decreased muscle strength of the upper extremities and mild decreased range of motion of the shoulder bilaterally.  (Tr. 465).  Plaintiff's gait was within normal limits, and plaintiff was able to ambulate without specific deficits.  (Tr. 466).  Dr. Tate concluded that plaintiff had "lupus arthritis with joint pain and fatigue and would have difficulties with [a] full-time job.  She would be limited to 4 hours of work per day and standing or walking for more than one half hour at a time and she would be limited from lifting more than 20 pounds and from lifting above shoulder height."  (Id.).

Marsha Toll, Psy.D, a state agency non-examining psychologist, completed a Psychiatric Review Technique on August 3, 2009.  (Tr. 467-78).  Dr. Toll expressed the opinion that plaintiff had mild limitations in her ability to maintain social functioning; and moderate limitations in her activities of daily living, and ability to maintain concentration, persistence, or pace.  (Tr. 475).  Dr. Toll stated that the evidence in the file showed that plaintiff was limited at that time, but "with continued improvement and [treatment] [plaintiff] will have the ability to complete simple verbal directions, make simple decisions and adapt to routine changes."  (Tr. 478).

Dr. Toll also completed a Mental Residual Functional Capacity Assessment, in which she expressed the opinion that plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 479-80).

Despine Coulis, M.D., a state agency non-examining physician, completed a Physical Residual Functional Capacity Assessment on August 6, 2009.  (Tr. 482-89).  Dr. Coulis expressed the opinion that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull an unlimited amount.  (Tr. 483).  Dr. Coulis found that plaintiff could only occasionally climb, stoop, kneel, crouch, and crawl; and that she should avoid concentrated exposure to hazards.  (Tr. 486-87).

In a letter dated August 19, 2009, Dr. Esther stated that plaintiff was under his care from September 2008 through May 2009 for diagnoses of SLE, connective tissue disease, positive lupus anticoagulant, and arthritis.  (Tr. 491).  Dr. Esther stated that he instructed plaintiff not to work during that time frame due to the nature of her health and the effects of the symptoms.  (Id.).

Plaintiff presented to Dr. Zhang on September 3, 2009, at which time she reported improved mood.  (Tr. 727).  Plaintiff's affect was described as euthymic.  (Id.).

On September 30, 2009, Dr. Stegeman completed a Medical Report Including Physician's Certification/Disability Evaluation.  (Tr. 502).  Dr. Stegeman stated that he had last seen plaintiff on July 24, 2009, and that her chief complaints were SLE, connective tissue disease, positive lupus anticoagulant, and arthritis.  (Id.).  Dr. Stegeman indicated that plaintiff frequently gets

ulcers in her nose and mouth, and has SLE with pain.  (Id.).  Dr. Stegeman listed plaintiff's

primary diagnoses as SLE and connective tissue disease and her secondary diagnoses as positive

lupus anticoagulant and arthritis.  (Tr. 503).  Dr. Stegeman concluded that plaintiff "has severe

systemic lupus and is 100% disabled + cannot work for at least a year."  (Id.).

Plaintiff presented to Dr. Zhang on October 5, 2009, at which time she reported improved

mood and loss of motivation.  (Tr. 726).  Plaintiff's affect was described as euthymic.  (Id.).  On

December 3, 2009, plaintiff reported that she was "doing ok," and that her mood was stable.  (Tr.

725).  Dr. Zhang described plaintiff's affect as euthymic.  (Id.).

Plaintiff presented to Dr. Zhang on March 15, 2010, with complaints of low mood, lack of

energy and motivation, and poor concentration.  (Tr. 724).  Plaintiff reported complete sobriety

from alcohol since her last visit.  (Id.).  Upon mental status examination, Dr. Zhang described

plaintiff's mood as "ok," and her affect as dysthymic.  (Id.).  Dr. Zhang diagnosed plaintiff with

major depressive disorder, ADHD,[17] alcohol abuse, with a GAF score of 55-60.[18]  (Id.).  Dr.

Zhang continued plaintiff's medications.  (Id.).

In a letter dated April 23, 2010, Dr. Zhang stated that plaintiff had been under his care

since July 2009, at which time he diagnosed her with major depression.  (Tr. 722).  He noted that

plaintiff was also under the care of Dr. John Esther for lupus.  (Id.).  Dr. Zhang stated "[b]ecause

of these medical impairments, [plaintiff] is unable to work."  (Id.).

---

[17]Attention deficit hyperactivity disorder ("ADHD") is a behavioral disorder manifested by
developmentally inappropriate degrees of inattentiveness (short attention span, distractability),
impulsiveness, and hyperactivity.  Stedman's at 568.

[18]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

- 13 -

Plaintiff presented to Dr. Zhang on May 13, 2010, at which time she complained of anxiety symptoms because her son was deployed to Afghanistan. (Tr. 723). Plaintiff reported that her mood had been fairly stable, and her sleep and appetite were fine. (Id.). Upon mental status exam, Dr. Zhang found that plaintiff's affect was dysthymic. (Id.). Dr. Zhang diagnosed plaintiff with major depressive disorder, ADHD, alcohol abuse, and a GAF score of 55-60. (Id.). He continued plaintiff's medications. (Id.).

In a report dated July 23, 2010, Dr. Zhang indicated that, in his best medical opinion, plaintiff was totally disabled without consideration of any past or present drug or alcohol abuse, and that plaintiff was not currently using drugs or alcohol. (Tr. 744).

Dr. Zhang completed a Psychiatric/Psychological Impairment Questionnaire on July 29, 2010, in which he indicated that he was treating plaintiff every two months for diagnoses of major depressive disorder, ADHD, and anxiety, with a current GAF score of 55-60 and the lowest GAF score in the past year of 45-50.[19] (Tr. 733). Dr. Zhang listed the following clinical findings that support his diagnosis: poor memory; oddities of thought, perception, speech, or behavior; appetite disturbance with weight change; time or place disorientation; catatonia or grossly disorganized behavior; mood disturbance; social withdrawal or isolation; decreased energy; substance dependence; manic syndrome; recurrent panic attacks; obsessions or compulsions; anhedonia or pervasive loss of interests; intrusive recollections of a traumatic experience; persistent irrational fears; paranoia or inappropriate suspiciousness; generalized persistent anxiety; feelings of guilt/worthlessness; somatization unexplained by organic disturbances; difficulty thinking or

_____

[19]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

- 14 -

concentrating; and hostility and irritability.  (Tr. 734).  Dr. Zhang indicated that plaintiff's primary symptoms were severe depression, anxiety, memory problems, chronic fatigue, and joint pain. (Tr. 735).  Dr. Zhang found that plaintiff was markedly limited in all areas of understanding and memory, sustained concentration and persistence, social interactions, and adaptation.  (Tr. 736-38).  Dr. Zhang indicated that plaintiff experienced episodes of deterioration or decompensation in work settings which caused her to withdraw from that situation and experience exacerbation of symptoms.  (Tr. 738).  Dr. Zhang explained that plaintiff "can't comprehend and she can't function in a work environment."  (Id.).  Dr. Zhang listed plaintiff's psychiatric medications as Seroquel, Klonopin, and Adderall.  (Id.).  Dr. Zhang indicated that plaintiff's impairments would last at least twelve months.  (Tr. 739).  Dr. Zhang stated that plaintiff's psychiatric condition exacerbated the joint pain caused by her lupus.  (Id.).  Dr. Zhang found that plaintiff was incapable of even "low stress" work, explaining that plaintiff becomes extremely fatigued and depressed and that she is unable to take steroids because they make her manic.  (Id.).  Dr. Zhang indicated that plaintiff's impairments were likely to produce "good days," and "bad days."  (Id.). Finally, Dr. Zhang found that plaintiff would likely be absent from work as a result of her impairments more than three times a month.  (Tr. 740).

Dr. Zhang completed another Psychiatric/Psychological Impairment Questionnaire on April 14, 2011, in which he indicated that he had last seen plaintiff on April 14, 2011.  (Tr. 759-66).  Dr. Zhang indicated that plaintiff's current GAF score was 50-55.  (Tr. 759).  Dr. Zhang's opinions regarding plaintiff's ability to work remained unchanged.  (Tr. 762-65).  Dr. Zhang

noted that plaintiff was becoming more depressed and that he had added Prozac[20] to her medication regimen.  (Tr. 766).

### The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.   The claimant has not engaged in any substantial gainful activity since February 2, 2009, the alleged onset date.  (20 CFR 404.1571 *et seq*., and 416.971 *et seq.*).

3.   The claimant has the following "severe" impairments: Lupus and Major Depressive Disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  The claimant is able to occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl.  She can never climb ropes, ladders, and scaffolds.  She should avoid concentrated exposure of the hazards of unprotected heights and moving and dangerous machinery.  She is able to understand, remember, and carry out at least simple verbal instructions and non-detailed tasks, demonstrate adequate judgment to make simple, work-related decisions, and adapt to routine/simple work changes.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on September 28, 1963 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in

---

[20]Prozac is an antidepressant indicated for the treatment of major depressive disorder.  <u>See</u> <u>PDR</u> at 1854.

English (20 CFR 404.1564 and 416.964).

9.      Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 2, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 23-31).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on February 9, 2009, the claimant is not disabled under sections 216(I)    and 223(d) of the Social Security Act.

Based on the application protectively filed for supplemental security income October 6, 2008, the claimant is not disabled under section 1614(a)(3)(A), of the Social Security Act, as amended.

(Tr. 31).

## Discussion

## A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

**B.**     **The Determination of Disability**

        The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

        The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in finding that plaintiff's impairments did not meet Listing 12.04.  Plaintiff next argues that the ALJ erred in weighing the medical opinion evidence.  Plaintiff also contends that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitations.  Plaintiff finally argues that the ALJ relied upon flawed vocational expert testimony to conclude that plaintiff could perform other work.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

**1.      Credibility Analysis**

Plaintiff argues that the ALJ erred in determining the credibility of plaintiff's subjective complaints of pain and limitations.  Specifically, plaintiff contends that the ALJ's findings that plaintiff's lupus was controlled with treatment, and that plaintiff had used drugs or alcohol since February of 2009 were unsupported by the record.  Plaintiff also argues that the ALJ failed to

- 20 -

discuss any of the relevant Polaski factors, including plaintiff's good work record.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The ALJ found that the record was "replete with notations of continued alcohol and drug abuse, which has interfered and compromised prescribed treatment." (Tr. 25). The ALJ pointed out that Dr. Esther discharged plaintiff due to non-compliance and multiple attempts to secure narcotics. (Id.). It is true that Dr. Esther discharged plaintiff from his care in a letter dated May 28, 2009, noting that the physician-patient relationship had deteriorated beyond repair. (Tr. 695). Dr. Esther indicated in a handwritten note dated May 2009 that plaintiff had attempted to secure narcotics on multiple occasions, and that he told plaintiff's mother that plaintiff had a narcotic problem and needed help. (Tr. 362). Plaintiff was hospitalized for respiratory failure secondary to polysubstance overdose in February 2009. (Tr. 316). Plaintiff reported that she placed multiple Fentanyl patches and drank vodka to control her pain. (Tr. 317). The fact that plaintiff

has abused drugs and alcohol, and was discharged from Dr. Esther's care for this reason does detract from plaintiff's credibility. As plaintiff points out, however, there is no indication in the record that plaintiff used alcohol since her February 2009 hospitalization or that she used any illegal drugs.

The ALJ discussed plaintiff's daily activities. The ALJ stated that plaintiff alleged an inability to perform activities of daily living, such as cooking, cleaning, and shopping. (Tr. 25). The ALJ noted that plaintiff had moved in with her parents. (Id.). The, ALJ, however, found that "such severe functional limitations are not supported by the medical evidence relating to her SLE or Depression." (Id.).

The ALJ next discussed the objective medical evidence. The ALJ found that the medical evidence does not support the alleged severity of plaintiff's subjective complaints and functional limitations. (Tr. 25). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ stated that plaintiff's SLE, depressive disorder, and substance addiction disorder are all controlled with compliance with prescribed treatment. (Tr. 25). The ALJ indicated that plaintiff has not had frequent flare ups, and her infrequent flare ups have responded quickly to treatment. (Id.).

Plaintiff contends that the ALJ failed to cite any evidence that plaintiff's lupus was controlled with treatment. The medical record reveals that plaintiff was hospitalized for a flare-up of SLE from October 8, 2008, through October 13, 2008. (Tr. 239). Plaintiff was hospitalized for exacerbation of SLE from January 19, 2009, through January 22, 2009. (Tr. 214). Plaintiff

- 22 -

complained of peripheral edema, shortness of breath, abdominal bloating, and severe fatigue. (Id.). Plaintiff saw Dr. Esther on January 29, 2009, with complaints of blisters on her tongue and severe joint pain. (Tr. 381). Dr. Esther noted that plaintiff had been seen in the emergency room the previous night. (Id.). Plaintiff presented to the emergency room on February 3, 2009, with complaints of muscle pain due to a lupus flare-up. (Tr. 283). Plaintiff returned to the emergency room on May 13, 2009, with complaints of nausea, vomiting, diarrhea, dehydration, joint pain, muscle pain, muscle spasm, and exacerbation of SLE. (Tr. 698). Upon examination, Dr. Esther noted that plaintiff's joints revealed inflammatory changes and tenderness diffusely, which was typical of SLE flare. (Tr. 699).

The objective medical evidence discussed above reveals that plaintiff frequently sought emergency room treatment due to lupus flare-ups. As such, the medical evidence does not support the ALJ's findings that plaintiff's lupus flare-ups were infrequent and her lupus was controlled with treatment. Thus, the ALJ erred in discrediting plaintiff's subjective complaints on this basis.

Further, the ALJ did not discuss any of the other Polaski factors. As plaintiff correctly points out, the ALJ did not discuss plaintiff's good work history, which weighs in favor of her credibility. Specifically, plaintiff notes that she had consistent earnings for twenty-five years prior to her alleged disability. See Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008) (unbroken earnings record from 1961 to 1999 weighed in favor of claimant's credibility).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives

- 23 -

good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

In this case, the ALJ erred in finding that the plaintiff's lupus was controlled with treatment.  The ALJ also failed to credit plaintiff's good work history when determining her credibility.  While the ALJ properly discredited plaintiff based on her drug and alcohol use, the ALJ primarily relied on his finding that plaintiff's lupus was controlled with treatment in discrediting plaintiff's subjective complaints.  The ALJ, for example, discredited plaintiff's testimony regarding her daily activities due to the alleged lack of medical evidence to support her restricted activities.  Therefore, the reasons given by the ALJ for discrediting plaintiff's complaints of disabling pain are insufficient and his finding that plaintiff's complaints are not credible is not supported by substantial evidence.

**2.      Medical Opinion Evidence**

Plaintiff argues that the ALJ erred in finding that plaintiff's impairments did not meet Listing 12.04.  Plaintiff also argues that the ALJ erred in weighing the medical opinion evidence.  The determination of whether plaintiff meets Listing 12.04 depends on the ALJ's evaluation of the medical opinion evidence in this case.  As a result, the undersigned will discuss the ALJ's analysis of the medical opinion evidence first.

Plaintiff claims that the ALJ failed to properly weigh the medical opinions of Drs. Zhang and Politte regarding plaintiff's psychiatric impairments, and the opinions of Drs. Stegeman and Tate regarding plaintiff's physical impairments.  Plaintiff contends that the ALJ relied instead on the opinions of non-examining state agency medical consultants.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision

- 24 -

the weight given to any opinions from treating sources, nontreating sources and nonexamining sources.  See 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).  The Regulations require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective
> medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians.  See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole.  Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004).  When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the

treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

With regard to plaintiff's physical impairments, plaintiff contends that the ALJ erred in rejecting the opinion of Dr. Stegeman.  On September 30, 2009, Dr. Stegeman completed a Medical Report Including Physician's Certification/Disability Evaluation, in which he indicated that he had last seen plaintiff on July 24, 2009 and that plaintiff frequently gets ulcers in her nose and mouth and has SLE with pain.  (Tr. 502).  Dr. Stegeman listed plaintiff's primary diagnoses as SLE and connective tissue disease and her secondary diagnoses as positive lupus anticoagulant and arthritis.  (Tr. 503).  Dr. Stegeman expressed the opinion that plaintiff "has severe systemic lupus and is 100% disabled + cannot work for at least a year."  (Id.).

The ALJ acknowledged Dr. Stegeman's opinion, but found that it was not supported by Dr. Stegeman's treatment records.  (Tr. 28).  The ALJ stated that most of Dr. Stegeman's treatment notes focus on plaintiff's requests for more medications and indicate drug-seeking behavior.  (Id.).

Dr. Stegeman had been plaintiff's treating family physician since June 2007.  (Tr. 347-49).  Dr. Stegeman indicated that he had been treating plaintiff for SLE, connective tissue disease, positive lupus anticoagulant, and arthritis, and that plaintiff was also seeing Dr. Esther for these conditions.  (Tr. 502).  Dr. Stegeman's handwritten treatment notes are difficult to read, and

provide little detail. (Tr. 347-49). Dr. Stegeman's treatment notes indicate that he treated plaintiff's pain complaints with medication. (Id.). While Dr. Stegeman's treatment notes do not reflect any objective findings, records from Dr. Esther as well as emergency room records from this time period reveal that plaintiff had a positive lupus anticoagulant and was treated for frequent lupus flare-ups. As such, Dr. Stegeman's opinion is supported by the medical evidence of record.

Plaintiff also contends that the ALJ erred in discrediting the opinion of consulting physician Dr. Tate. Dr. Tate saw plaintiff on July 23, 2009, for an independent medical examination at the request of the state agency. (Tr. 465-66). Dr. Tate expressed the opinion that plaintiff had "lupus arthritis with joint pain and fatigue and would have difficulties with [a] full-time job." (Tr. 466). Dr. Tate found that plaintiff would be limited to four hours of work a day; could only stand or walk for one half hour at a time; and could lift no more than twenty pounds, with no lifting above shoulder height. (Id.).

The ALJ noted that Dr. Tate's physical examination revealed few abnormalities. (Tr. 26). The ALJ stated that "[i]t is clear that Dr. Tate based her opinion of the claimant's residual functional capacity to perform work activities upon the claimant's subjective complaints." (Id.). The ALJ concluded that Dr. Tate's opinion "is not entitled to significant evidentiary weight herein." (Id.).

The opinion of Dr. Tate, who examined plaintiff on only one occasion, was not entitled to controlling weight. It is true that Dr. Tate's physical examination did not reveal any significant abnormalities. Dr. Tate, however, also reviewed plaintiff's medical records. Dr. Tate indicated that she reviewed records from plaintiff's hospitalizations at St. Luke's in October 2008 and January 2009, which reveal a diagnosis of lupus. (Tr. 465). While Dr. Tate did not note

significant findings on examination, her opinion was that the joint pain and fatigue associated with plaintiff's lupus would prevent plaintiff from working full-time.

After discrediting the opinions of Drs. Stegeman and Tate, the ALJ indicated that he was assigning "significant weight" to the residual functional capacity evaluation of Dr. Coulis.  (Tr. 29).  Dr. Coulis is a non-examining state agency physician who completed a Physical Residual Functional Capacity Assessment on August 6, 2009.  (Tr. 482-89).  Dr. Coulis expressed the opinion that plaintiff  could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull an unlimited amount.  (Tr. 483).  Dr. Coulis found that plaintiff could only occasionally climb, stoop, kneel, crouch, and crawl; and that she should avoid concentrated exposure to hazards.  (Tr. 486-87).

"The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  The ALJ erred in rejecting the opinion of plaintiff's treating physician, Dr. Stegeman, and consulting physician Dr. Tate, and relying on the opinion of a non-examining state agency physician.  It is significant that the only physicians who examined plaintiff expressed the opinion that plaintiff was unable to work due to her lupus.  Even Dr. Esther, plaintiff's treating rheumatologist who discharged plaintiff from his care in May 2009 due to plaintiff's drug-seeking behavior, expressed the opinion that plaintiff was unable to work during the time he treated her.  (Tr. 491).  While Dr. Stegeman's treatment notes are not detailed, the objective medical evidence reveals that plaintiff was hospitalized frequently for lupus flares.  As a result, the medical record is consistent with Dr. Stegeman's findings.  The ALJ's decision to discredit the opinions of Drs.

Stegeman and Tate and rely on the opinion of Dr. Coulis is not supported by substantial evidence.

Plaintiff also contends that the ALJ erred in weighing the medical opinions regarding plaintiff's psychiatric impairments.  Specifically, plaintiff argues that the ALJ erred in discrediting the opinions of Drs. Zhang and Politte.  Dr. Zhang completed a Psychiatric/Psychological Impairment Questionnaire on July 29, 2010, in which he indicated that he was seeing plaintiff every two months for diagnoses of major depressive disorder, ADHD, and anxiety, with a current GAF score of 55-60 and the lowest GAF score in the past year of 45-50.  (Tr. 733).  Dr. Zhang expressed the opinion that plaintiff was markedly limited in all areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (Tr. 736-38).  Dr. Zhang also found that plaintiff experienced episodes of deterioration or decompensation in work settings, which caused her to withdraw and experience exacerbation of symptoms.  (Tr. 738).  Dr. Zhang stated that plaintiff "can't comprehend and she can't function in a work environment."  (Id.).  Dr. Zhang also indicated in a letter dated April 23, 2010, that plaintiff was unable to work due to her major depression and lupus.  (Tr. 722).  Finally, Dr. Zhang completed a report dated July 23, 2010, in which he indicated that plaintiff was totally disabled without consideration of any past or present drug or alcohol abuse, and that plaintiff was not currently using drugs or alcohol.  (Tr. 744).

The ALJ rejected the opinions provided in Dr. Zhang's Psychiatric/Psychological Impairment Questionnaire, finding that Dr. Zhang's opinions were inconsistent with his GAF scores, and his treatment notes.  (Tr. 27-28).  The ALJ also stated that Dr. Zhang saw plaintiff "only seven times" for outpatient psychotherapy during the period of July 6, 2009 through May 13, 2010, and that plaintiff's symptoms and function improved.  (Tr. 28).  With regard to Dr.

- 29 -

Zhang's letter and report, the ALJ accurately pointed out that these were conclusory statements on issues reserved for the Commissioner.  (Id.).

Dr. Zhang was plaintiff's treating psychiatrist and saw plaintiff approximately every two months for diagnoses of major depressive disorder, ADHD, and anxiety.  (Tr. 733).  Consequently, Dr. Zhang's opinion was entitled to controlling weight if it was well-supported and not inconsistent with other evidence in the record.  The opinions provided by Dr. Zhang in his questionnaire were well-supported.  Dr. Zhang indicated that the following clinical findings supported his diagnoses: poor memory; oddities of thought, perception, speech, or behavior; appetite disturbance with weight change; time or place disorientation; catatonia or grossly disorganized behavior; mood disturbance; social withdrawal or isolation; decreased energy; substance dependence; manic syndrome; recurrent panic attacks; obsessions or compulsions; anhedonia or pervasive loss of interests; intrusive recollections of a traumatic experience; persistent irrational fears; paranoia or inappropriate suspiciousness; generalized persistent anxiety; feelings of guilt/worthlessness; somatization unexplained by organic disturbances; difficulty thinking or concentrating; and hostility and irritability.  (Tr. 734).  These symptoms support the presence of marked limitations.  Dr. Zhang's treatment notes indicate that plaintiff complained of loss of desire and motivation, poor concentration, low mood, lack of energy, and anxiety.  (Tr. 729, 726, 724, 723).  On examination, plaintiff's mood ranged from dysthymic to euthymic.  (Id.).  Dr. Zhang prescribed psychotropic drugs to treat these symptoms, including Cymbalta, Klonopin, and Seroquel.  (Id.).  Dr. Zhang's treatment notes are consistent with his opinions.

The ALJ indicated that Dr. Zhang's GAF score of 55-60 noted in his questionnaire was inconsistent with his opinion that plaintiff had marked limitations.  (Tr. 733).  First, while Dr. Zhang did note a current GAF score of 55-60, he also indicated that plaintiff's lowest GAF score

- 30 -

in the past year was 45-50.  (Id.).  A GAF score of 45 to 50 is indicative of a serious impairment

in occupational functioning and is thus consistent with marked limitations.  Second, the

Commissioner has declined to endorse the GAF scale for use in the Social Security disability

programs.  See Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Howard v. Comm'r of

Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to

the ALJ in formulating the [residual functional capacity], it is not essential to the RFC's

accuracy.").

In addition, there is no other medical evidence in the record that conflicts with Dr.

Zhang's findings.  Rather, the only other examining mental health provider, psychologist Dr.

Politte, expressed the opinion on July 22, 2009 that plaintiff was unable to work.  (Tr. 460).  Dr.

Politte diagnosed plaintiff with major depressive disorder and assessed a GAF score of 35.  (Id.).

The ALJ discredited Dr. Politte's opinion, finding that, as with the opinion of Dr. Tate, it

was based upon plaintiff's subjective complaints rather than objective findings.  (Tr. 26).  The

ALJ stated that he was unable to discern the basis for Dr. Politte's GAF score and statement of

inability to work when the rest of his evaluative findings are reviewed.  (Id.).  The ALJ pointed

out that Dr. Politte found on examination that plaintiff had a good ability to understand

conversation, good social interaction, and no abnormalities in concentration, memory, judgment,

or thinking.  (Tr. 26, 458).

The ALJ indicated that he was according "significant weight," to the opinion of state

agency psychologist Dr. Toll.  (Tr. 29).  Dr. Toll expressed the opinion that plaintiff had mild

limitations in her ability to maintain social functioning; and moderate limitations in her activities of

daily living, and ability to maintain concentration, persistence or pace.  (Tr. 475).  Dr. Toll stated

that, although the evidence revealed that plaintiff was limited at that time, "with continued

improvement and [treatment] [plaintiff] will have the ability to complete simple verbal directions, make simple decisions and adapt to routine changes." (Tr. 478).

The undersigned finds that the ALJ erred in rejecting the opinions of treating psychiatrist Dr. Zhang and consulting psychologist Dr. Politte, and relying on the opinion of a non-examining state agency psychologist. To be sure, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments, including those by consulting sources, are supported by better or more thorough medical evidence. See Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). Here, however, it can hardly be said that Dr. Toll's opinion from August 3, 2009, was supported by better or more thorough medical evidence than Dr. Zhang's opinions through April 2011. Dr. Toll did not have the benefit of Dr. Zhang's treatment notes and opinions. Dr. Zhang, as plaintiff's treating psychiatrist, was able to provide an opinion based on a longitudinal picture of plaintiff's impairments. It is significant that every mental health provider who examined plaintiff in this case found greater restrictions than those found by the non-examining state agency psychologist. In light of the above, the court concludes that the ALJ failed to justify his decision through a showing of substantial evidence.

As previously noted, plaintiff also argues that the ALJ erred in finding that plaintiff's impairments did not meet Listing 12.04, the listing for affective disorders. The ALJ's determination that plaintiff did not meet or equal Listing 12.04 was based on his evaluation of the medical opinion evidence, which the undersigned has found was erroneous. As such, upon remand, after the ALJ properly weighs the medical opinion evidence in this case, the ALJ should determine whether plaintiff's condition meets or equals listing 12.04.

Plaintiff finally argues that the ALJ relied upon flawed vocational expert testimony to conclude that plaintiff could perform other work. Because the ALJ's step five determination was

based upon the ALJ's erroneous credibility determination and evaluation of the medical opinion evidence, this determination is similarly unsupported by substantial evidence.

## Conclusion

In sum, the undersigned finds that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation, and in relying on the opinions of non-examining state agency medical consultants.  As such, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly assess plaintiff's credibility, weigh the medical opinion evidence, determine whether plaintiff's condition meets or equals listing 12.04, and then proceed with the sequential analysis.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.


Dated this  24th  day of September, 2012.


LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE